IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| ROY C. DAVIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:11-CV-929-WKW |
| | ) | [WO] |
| INTERNATIONAL PAPER | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant International Paper Company's ("IP") motion for summary judgment (Doc. # 39), which has been fully briefed (Docs. # 40, 41, 42, 43, 44, 45, 46 (Brief and Evidence); 49, 50 (Opposition Brief and Evidence); 51 (Reply)).[1]   After considering the parties' arguments, the evidence, and the relevant law, the court finds that Defendant's motion is due to be granted.

## I.  JURISDICTION AND VENUE

The court exercises subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.  Personal jurisdiction and venue are uncontested.

## II.  STANDARD OF REVIEW

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and [he] is entitled to judgment as a

---

[1] Any citation to a document in the record is to the page number created by CM/ECF.

matter of law." Fed. R. Civ. P. 56(a).  The court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact.  *Id.*  A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor.  *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).  If the movant meets its evidentiary burden, the burden shifts to the nonmoving party to establish – with evidence beyond the pleadings – that a genuine dispute material to each of its claims for relief exists.  *Celotex*, 477 U.S. at 324.

### III. BACKGROUND

Plaintiff Roy Davis is a fifty-four-year-old black male.[2]  Since February 2005, Mr. Davis has been employed with IP at its paper mill in Prattville, Alabama ("the Mill").  He began his tenure with IP at the bottom as a Spare Hand in the paper department.  He has progressed the ranks from Spare Hand to Utility

---

[2] At least, he was fifty-four when IP filed its motion for summary judgment in August 2013.

Worker, to 6th Hand Operator, to 5th Hand Operator, and finally, to his present position as 4th Hand Operator.[3]  All of these positions on the line at the Mill are hourly paid positions, and all hourly employees are represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("the Union").

Mr. Davis has sought, however, a higher paying leadership position with IP since he began working in 2005.  He believes he is qualified by experience, education, and IP-specific training to work in a supervisory role.

Mr. Davis retired from the U.S. Army in January 2005 as a sergeant first class.  During his military tenure, Mr. Davis supervised others and attended management courses.  While in the Army, he also completed a bachelor's degree at Washington State University in Human Development in 2002.  When he applied to work for IP, Mr. Davis expressed his desire to work in management.  Then-HR Generalist for the Mill, Rusty Adair, told Mr. Davis that he must first work as an hourly employee, learn the Mill's paper-making process, and gain experience in

---

[3] After 4th Hand Operator, the higher wage hourly positions are, in order of rank: Winder Operator, Dry End Operator, 2nd Machine Operator, 1st Machine Operator, and Crew Chief. Vacant positions in the hourly workforce are filled based on department seniority.  While an employee is in a particular position, he also trains for the next position up the ladder so that he can substitute when there is a vacancy.  Fill-in or substitute assignments are called "set-up" positions.  During the time that an employee works in a "set-up" position, he receives the pay associated with that higher position.

All promotions up the hourly wage chain at the Mill are subject to the Union's collective bargaining agreement with IP which requires that seniority determine the filling of vacancies.

the industry.  Then, as he progressed at IP, he would have the opportunity to seek a supervisory position.

During his employment with IP, Mr. Davis has worked on both of the Mill's two paper-making machines.  Each machine has a wet end and a dry end.  All of Mr. Davis's permanent positions have been on the dry end, but Mr. Davis has become acquainted with the wet end as well, working there during machine breaks and field days.  He estimates that he has been on the wet end of the paper machine some fifty to one hundred times.  Mr. Davis says he knows how the wet end operates, what chemicals are involved and included in the pulp, how the panel board operates, what causes the wet end to break down, how to thread the machine, how to splice ropes, and how to seam felts.

## A.    Set-up Supervisory Promotion Opportunities at the Mill

The Mill employs a permanent, salaried supervisor for each paper machine who oversees the entire paper-making process (wet and dry ends) and the crew members.  In a supervisor's absence, a "set-up supervisor" fills in.  A set-up supervisor remains an hourly employee, but he earns a pay premium of 10% more than the highest hourly rate in the department during the time that he works in the set-up supervisor position.[4]  Typically, IP trains two extra people to be set-up supervisors who can fill in when needed.  Mr. Davis explains that an IP employee

---

[4] Mr. Davis represents that this is roughly a $30 per hour pay rate, which is about $11 more per hour than what he typically earns.

who aspires to become a permanent supervisor would first have to become a set-up supervisor. IP represents that there is no formal application or interview process for the selection of set-up supervisors. If an employee is interested in becoming a set-up supervisor, that person self-identifies to his managers. Set-up supervisors are chosen by the Finished Products Manager, Mike Lyles, who is white, with the input of other members of IP management and Union leadership.

Additionally, IP represents, through Mr. Lyles's testimony, that selection of set-up supervisors is based upon a candidate's demonstrated leadership at the Mill, departmental seniority,[5] experience, and paper-making knowledge. But IP has also indicated to Mr. Davis that other criteria matters, including: passing computerized leadership personality assessments and tests; taking "Technical Association of Pulp and Paper Industry" courses ("TAPPI courses"); undergoing two weeks of Front Line Leader ("FLL") training, which includes one week of leadership training and another week of paper-making training; and taking a college math course, or a business or financial math course equivalent. (*See* May 25, 2007 Letter from Melanie Snowden[6] (Doc. # 49-10); *see also* Oct. 29, 2009 Email from Joe Crosby[7] to Mike Lyles (Doc. # 49–18) (citing Mr. Davis's completion of leadership skills

---

[5] Mr. Lyles says that seniority matters "to an extent." IP's position in its summary judgment brief appears to be that seniority is a factor.

[6] Melanie Snowden's name changed to Melanie Giles. (Dep. Melanie Giles, at 7:4–12 (Doc. # 42-2, at 3).) She is referenced by both names in this opinion.

[7] Mr. Crosby is the current HR Manager at the Mill.

5

class, TAPPI course, finance course, and math equivalent).)  However, IP has not required these criteria of every set-up supervisor candidate.   Mr. Lyles has testified, "There's really no criteria for . . . who, when[,] or how" set-up supervisors are chosen.  (Dep. Mike Lyles at 42:23–43:1 (Doc. # 42-1, at 12).)  Mr. Davis's case is about his non-promotion to a set-up supervisory role despite his efforts to comply with IP's requirements for the position.

**B.**    **Younger, White Comparators Promoted to Set-up Supervisor**

Mr. Davis's suit challenges IP's promotion of three younger, white comparators as set-up supervisors and IP's denial of complete FLL training to Mr. Davis, which Mr. Davis claims has impeded him from advancing to set-up supervisor.

**1.**    *Mike Stone (2006)*

Mike Stone was promoted to a set-up supervisor position in 2006.  Mr. Stone is white and forty-three; but at the time of his promotion, he was in his mid-thirties.  He has not gone to college or completed a college-level math course.  He never worked in a permanent position on the wet end of the paper machines and lacked prior supervisory experience.  In 2010, IP promoted Mr. Stone to a salaried position as a process manager.

IP explains that Mr. Stone has worked for IP since 2001, and in the paper department since February 2003.  Thus, Mr. Stone had more seniority than Mr.

Davis when he was promoted.  He climbed the ladder from Spare Hand to 6th Hand Operator before becoming a set-up supervisor.  Mr. Stone was selected by Mr. Lyles's predecessor, Tim Stocker.  IP says that Mr. Stone took personal initiative to learn more about the paper-making process.

### 2.    *James Northington (2009 – 2010)*

In 2009, another set-up supervisor position opened, and Mr. Davis told Mr. Lyles that he was interested in being considered.  The position was never posted. James Northington, a white, twenty-nine-year-old was promoted instead of Mr. Davis in April 2010.[8]  Mr. Northington has less education than Mr. Davis, and Mr. Lyles did not ask Mr. Northington if he had obtained college-level math credit. Mr. Northington received the second week of FLL training that Mr. Davis complains that IP has denied to him.   Mr. Northington testified that he was unaware that seniority played a role in management's decision to fill set-up supervisor vacancies.   (Dep. James Northington, at 123:3–124:4 (Doc. # 41-1, at 32).)  Mr. Northington was never a permanent employee on the wet end of the machine.

IP asserts that Mr. Northington has more paper department seniority than Mr. Davis – a fact that Mr. Davis strongly disputes.   IP explains that Mr. Northington accepted a transfer from IP's shipping department to the paper

---

[8] IP clarifies that Mr. Northington actually began training for the set-up supervisory role in October 2009, but began performing set-up supervisory duties in April 2010.

department in October 2004.  He was not released to work in the paper department, however, until April 17, 2005.  IP claims that it has been IP and the Union's agreed practice to protect the seniority of a person in Mr. Northington's situation by regarding him or her as more senior than any subsequently, externally hired employee like Mr. Davis, even if the external hire actually begins work in the more senior employee's transfer department first.  Thus, Mr. Northington and several other similarly situated employees were given a paper department seniority date of February 22, 2005, one day ahead of Mr. Davis, who began on February 23, 2005.  (Decl. Joe Crosby, at ¶ 20 (Doc. # 45-4, at 4–5).)[9]

IP further represents that Mr. Northington was a superior candidate for a set-up supervisor position because he took initiative to familiarize himself with the paper-making process and demonstrated his potential as a leader.  When Mr. Northington expressed interest in becoming a set-up supervisor, Mr. Lyles surveyed Mr. Northington's supervisors.  Mr. Lyles says that the supervisors gave unanimous, positive support and commended Mr. Northington's knowledge and

---

[9] Mr. Davis asserts that he has been working in the paper department longer than Mr. Northington.  He alleges that IP misrepresented Mr. Northington's seniority when it responded to Mr. Davis's EEOC charge.  (Doc. # 50, at 14 (citing Dep. Joe Crosby at 271–73 (Doc. # 43-1); IP Letter to EEOC (Doc. # 49-11).)

IP protests that pursuant to its collective bargaining agreement with the Union, Union members like Mr. Davis may file grievances to challenge IP's actions, including instances of alleged discrimination.  IP asserts that during Mr. Davis's deposition, for the first time, Mr. Davis alleged that the paper department seniority list, which placed Mr. Northington ahead of Mr. Davis for departmental seniority purposes, is wrong, and that he (Mr. Davis) has more departmental seniority.  IP contends that Mr. Davis neglected to invoke the grievance process as to the perceived error on the list.

respect among his peers.  In 2009, Mr. Lyles consulted the Union President, the PM1 Crew Chief, two Shift Managers, an Operations and Maintenance Coordinator, and two Area Process Managers, several of whom are black and the majority of whom are over age forty.[10]  Each of these Mill leaders recommended that Mr. Northington be advanced as a set-up supervisor.

### 3.    *Josh Cooper (2010)*

In 2010, Josh Cooper, who is white and was then thirty-seven years old, was placed in training for a set-up supervisor position.  The position was not posted. Like the other comparators, and like Mr. Davis, Mr. Cooper had only worked on the wet end of the paper machine on field days and during outages.  Although he was offered the job, Mr. Cooper and IP management mutually agreed that he would not continue in the position, so Mr. Cooper never actually served in the position or received the higher compensation that Mr. Davis covets.

IP claims that Mr. Cooper began working at the Mill in 2001 and is more senior than Mr. Davis.  Mr. Lyles consulted with the Union president, a Set-up Supervisor, and Operations and Maintenance Coordinator, and two Area Process

---

[10] IP represents that "Mike Lyles consulted Union president Daryl Hall (white, male, over 40), PM1 crew chief Willie Perry (black male, over 40), Shift Manager Leroy Byrd (black, male, over age 40), Shift Manager Charlie Brackin (white, male, over age 40), Operations and Maintenance Coordinator Jimmy Deramus (black, male, over age 40), Area Process Manager Mike Marion (white, male, under 40), and Area Process Manager Todd Luedtke (white, male, under 40)."  (Doc. # 46, at 16.)

Managers, all of whom had observed Mr. Cooper.[11]   These managers comprised black and white men, some over and some under forty years old.   They all recommended Mr. Cooper for the job.   IP cites Mr. Cooper's leadership ability, strong relationships with coworkers, work ethic, and personal drive to learn more about the paper-making process as attributes that made him worthy of appointment to a set-up supervisor position

**4.   *Set-up Supervisor Status Since 2010***

Since IP's consideration of Mr. Cooper in 2010, no one has been selected or trained for the set-up supervisor position.   There are presently two set-up supervisors in the paper department where Mr. Davis works: Mr. Northington, discussed *supra*, and Milton Broadnax, a black male over age forty.

**C.   <u>Denial of Promotion to Set-up Supervisor Position</u>**

When Mr. Davis observed Mr. Stone's promotion in 2006, he asked Mr. Lyles what it would take to be promoted to a set-up supervisor position.   Mr. Lyles told Mr. Davis that he needed to show more leadership.   Tim Stocker acknowledged Mr. Davis's interest in a letter dated June 28, 2006, that advised that he should take an online assessment test before IP would set up interviews.   (*See* Doc. # 49-9.)   Mr. Davis asserts that he took on more leadership responsibility on

---

[11] Namely, "Union president Daryl Hall (white, male, over 40), Set-up supervisor Willie Perry, (black, male, over 40), Operations and Maintenance Coordinator Jimmy Deramus, (black, male, over 40), Area Process Manager Todd Luedtke (white, male, under 40), and Area Process Manager Mike Marion (white, male, under 40)."   (Doc. # 46, at 16–17.)

the safety committee and sharpened his skills on the paper machine. He stayed after his shift to become more familiar with the work, and he reviewed machine manuals.

Mr. Davis asserts that he was told, presumably by Melanie Giles, that he would be required to attend FLL training in order to assume a supervisory position. In April 2007, he attended the first week of FLL training. He has asked both Mr. Lyles and Joe Crosby about attending the second week of training, but he alleges that they have denied him the opportunity. Mr. Crosby testifies that Mr. Davis is not required to take the second week of FLL training in order to be considered for promotion. IP represents in the reply brief that the training has only been offered once since Mr. Davis finished the first week of FLL training. Further, Mr. Lyles testifies that FLL training was not a factor that he considered when making decisions about promoting employees to the set-up supervisor role.

Mr. Davis has also completed the TAPPI courses on his days off. Mr. Crosby testified that Mr. Davis has completed all the training needed to advance into a supervisory role. (*See* Dep. Joe Crosby, at 151:14–152:13) (Doc. # 43-1, at 39).)

In October 2009, Mr. Davis met with Mr. Crosby to inquire about the requirements to become a set-up supervisor. Mr. Crosby emailed Mr. Lyles about Mr. Davis's inquiry. On November 6, 2009, Mr. Davis met with Mr. Crosby and

Mr. Lyles. By this point, IP was already training Mr. Northington for the position. IP represents that Mr. Lyles advised Mr. Davis that he should continue to improve his leadership abilities and acquire more paper-making knowledge. Mr. Lyles reports that prior to the meeting, he had consulted Mill leadership, and they unanimously recommended against Mr. Davis's assignment to a set-up supervisor role, but Mr. Lyles did not tell Mr. Davis this because he did not want to disrupt Mr. Davis's working relationships with his superiors.[12]

**D.    Unrelated Allegations of Discrimination at the Mill**

Mr. Davis points out several unrelated race-based acts of discrimination at the Mill. For instance, during his deposition Mr. Northington admitted that he has heard employees at the Mill using racial slurs "jokingly," including the "N-word." (Dep. James Northington, at 30:8–33:17 (Doc. # 41-1, at 9–10).) He understands that he ought to have reported this to his superiors, pursuant to the EEO policy at IP, but he did not. Additionally, Mr. Lyles testified that a former set-up supervisor, Tracy Riddle, reportedly used the "N-word" toward a black female coworker. After investigating the incident, Mr. Lyles suspected it was true, and so he removed Mr. Riddle from his supervisory position.

---

[12] The persons who recommended against placing Mr. Davis in a set-up supervisor role were Jimmy DeRamus, Willie Perry, LeRoy Byrd, Charlie Brackin, and James Brackin. This group represents both whites and blacks, and men both under and over age forty.

Mr. Davis also cites case filed almost fifteen years ago in this district, *Mays v. Union Camp Corporation and International Paper Company*, 99-A-1282-N, where a black IP employee alleged he was denied placement in a set-up supervisor position because of his race.  And in *Williams v. International Paper Company*, 02-W-714-N, a plaintiff alleged retaliation for testifying against IP in *Mays*.

Finally, since Mr. Davis filed his EEOC charge in 2009, Mr. Davis has learned that a noose was discovered at the Mill.  Mr. Davis has not personally seen a noose or had any reason to believe it had anything to do with him, but he did see a picture of it via text message.

**E.** **EEOC Filing and Judicial Proceedings**

Four days after Mr. Davis met with Mr. Crosby and Mr. Lyles in November 2009, he filed his discrimination charge with the EEOC on November 10, 2009. He was fifty years old at the time.  The EEOC charge alleges that IP "skipped over" him for supervisory promotions on two occasions – 2007, and October 2009. (EEOC Charge (Doc. # 41-1, at 246).)[13]  He complained that the positions were not announced, and he asserted that he was more qualified than the candidates chosen who were white and under age forty.  Mr. Davis asserted his belief that he was being discriminated against on the basis of both his race and age.

---

[13] It is assumed that Mr. Davis meant 2006 rather than 2007.

On October 28, 2011, Mr. Davis filed this lawsuit pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981, and the Age Discrimination in Employment Act ("ADEA").  The court granted Mr. Davis leave to amend his complaint on May 7, 2012.  (Doc. # 13.)

## IV.  TITLE VII AND ADEA ANALYSIS FRAMEWORK

### A.  Race Discrimination Claims Under Title VII and § 1981

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  The Civil Rights Act of 1866, or § 1981, guarantees "all persons . . . the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens," and it also protects against race-based employment discrimination.

"Both [Title VII and § 1981] have the same requirements of proof and use the same analytical framework."  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).  Hence, courts "need not discuss [a] plaintiff's Title VII claims separately from his section 1981 . . . claims" when all claims "are based on the same set of facts."  *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).

Where, as here, there is no direct evidence of unlawful race-based discrimination, the plaintiff typically must use the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to show indirect

14

evidence of discrimination.  *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1174, 1181 (11th Cir. 2010).   Under the *McDonnell Douglas* framework, the plaintiff must first make a prima facie case of discrimination.  He makes a prima facie case of discrimination by demonstrating that: "(1) [he] is a member of a protected group; (2) [he] was qualified for [his] position; (3) [he] suffered an adverse employment action; and (4) employment . . . policies were differently applied to [him]."  *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012).   "[S]ummary judgment . . . is appropriate if [the plaintiff] fails to satisfy any one of the elements of a prima facie case."  *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1433 (11th Cir. 1998).

If the plaintiff makes his prima facie case of discrimination, "the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its actions."  *Gate Gourmet*, 683 F.3d at 1255.   And if the defendant proffers a nondiscriminatory reason, the burden returns to the plaintiff, who must show that the proffered reason is pretextual.  *Id.*  The plaintiff can demonstrate pretext by exposing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's reasoning.  *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007).

**B.**   <u>**Age Discrimination Claims Under ADEA**</u>

The ADEA prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's age."  29 U.S.C. §§ 623(a)(1) (emphasis added).  "In *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176 (2009), the Supreme Court held that the language 'because of' in the ADEA statute means that a plaintiff must prove that discrimination was the 'but-for' cause of the adverse employment action."  *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013). Both before and after *Gross*, the Eleventh Circuit has used the *McDonnell Douglas* framework to evaluate ADEA claims based on circumstantial evidence.  *Id.* at 1332–33.  But the Circuit has emphasized that, pursuant to *Gross*, the burden of persuasion in an ADEA case always remains with the plaintiff "to proffer evidence sufficient to permit a reasonable fact finder to conclude that the discriminatory animus was the 'but-for' cause of the adverse employment action."  *Id.* at 1332 (citing *Gross*, 557 U.S. at 176).  While *McDonnell Douglas* shifts the burden of *production* to the defendant, the plaintiff always carries the ultimate burden of *persuasion*.  *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993)).

# V.  DISCUSSION

**A.**   **Whether Mr. Davis's Claims Arising from IP's Promotion of Mr. Stone are Time-Barred**

IP argues that claims arising from Mr. Stone's appointment as a set-up supervisor in 2006 are barred by the two-year statute of limitations applicable to § 1981 claims and Title VII's requirement that a plaintiff file a charge of discrimination with the EOOC within 180 days of an alleged discriminatory act. (Doc. # 46, at 21–23.)   In response to IP's motion for summary judgment, Mr. Davis concedes that his claims, as they relate to Mr. Stone's promotion, are time-barred.  (Doc. # 50, at 3 n.1.)  Accordingly, summary judgment is due to be entered in IP's favor on Mr. Davis's claims that relate to IP's Promotion of Mr. Stone to a set-up supervisor position.

**B.**   **Whether Mr. Davis's Claims Relating to the Training that IP Allegedly Denied to Him is Actionable**

Next, IP argues that IP's selection of Mr. Northington and Mr. Cooper to shadow a supervisor and to otherwise train them for the set-up supervisor position is not actionable.   "Discrimination with respect to training programs is . . . actionable under the ADEA . . . as long as the training is materially related to the employee's job responsibilities or possibilities for advancement." *Turlington*, 135 F.3d at 1436; *see also Johnson v. Gestamp Ala., LLC*, 946 F. Supp. 2d 1180, 1202

(N.D. Ala. 2013) (applying *Turlington*'s materiality requirement in race discrimination context). IP reminds the court that "not all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Davis v. Town of Lake Park, Fla*., 245 F.3d 1232, 1238 (11th Cir. 2001). "[T]o support a claim under Title VII's anti-discrimination clause the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way." *Id.* at 1239. "[T]he asserted [economic] impact [on the plaintiff] cannot be speculative and must at least have a tangible adverse effect on [his] employment." *Id.* In sum, "an employee must show a serious and material change in the terms, conditions, or privileges of employment" that is "materially adverse as viewed by a reasonable person in the circumstances." *Id.*

IP asserts that its selection of Mr. Northington and Mr. Cooper for set-up supervisor training does not amount to materially adverse action and cites Mr. Davis's mistaken belief that the "shadow training" entailed higher pay for the candidate-in-training. IP points out that Mr. Cooper was allowed to train, but never promoted into the set-up supervisor role. IP argues that "[Mr.] Davis lost no term or benefit of employment" like higher pay or seniority when IP chose to train Mr. Northington or Mr. Cooper rather than him. (Doc. # 46, at 24 (citing *Johnson* 946 F. Supp. 2d at 1202).)

Mr. Davis responds that *Johnson* is inapposite and that he has established that IP disallowed him from completing the second week of FLL training.  (Doc. # 50, at 20.)  Hence, Mr. Davis contests the denial of FLL training – not the denial of any benefit of "shadow training" after a set-up supervisor candidate was selected, which presumably would be a benefit accompanying the promotion.  Mr. Davis argues that IP unfairly held his lack of knowledge about the Mill and its machinery against him when deciding not to promote him, while simultaneously withholding this benefit of additional training from him when he sought it.

IP replies that Mr. Davis's denial-of-FLL-training grievance is nonetheless non-actionable for several reasons.  First, it repeats the argument that the training was not "materially related to [Mr. Davis's] job responsibilities or possibilities for advancement."   *Turlington*, 135 F.3d at 1436.   IP contends that there is no evidence that Mr. Lyles considered the second week of FLL training to be a prerequisite for an employee's selection as a set-up supervisor because it was, in fact, not a prerequisite.  IP argues that Mr. Davis fails to provide evidence about how the training would have prepared him for the set-up supervisory position he desired.  Second, IP argues that Mr. Cooper never obtained FLL training, so one of Mr. Davis's comparators was never afforded the benefit that Mr. Davis complains he was denied.   Third, IP claims that Mr. Davis would have had only one opportunity to receive the second week of FLL training, and no one has offered the

training since Melanie Giles assumed a different position with IP.  And finally, IP protests that the denial of training claim is not identified in the EEOC charge, and Mr. Davis has failed to exhaust his administrative remedies concerning denial of training – another argument discussed *infra*.

The salient question is whether IP's denial of the second week of FLL training – for whatever reason – was "materially related to [Mr. Davis's] job responsibilities or possibilities for advancement."  *Turlington*, 135 F.3d at 1436. Notwithstanding Mr. Lyles's testimony that the training does not matter, a reasonable jury could conclude that the FLL training would have advantaged Mr. Davis and increased his odds at advancing to a supervisory role at IP.  (*See* May 25, 2007 Letter from Melanie Snowden (Doc. # 49-10, at 2 ("Many of you have already completed one or both of the week long [FLL] training sessions.  The purpose of this letter is to inform you of the other certification *requirements*, which must be completed for you to be a candidate for any temporary set-up or permanent supervisor positions.") (emphasis added)).)

Accordingly, IP's argument for summary judgment as to Mr. Davis's claims relating to the non-actionability of FLL training is without merit.

**C.**   **Whether Mr. Davis's Claims Relating to Mr. Cooper Must Fail Because Mr. Davis Did Not Exhaust Administrative Remedies**

Additionally, IP contends that Mr. Davis failed to exhaust his administrative remedies insofar as his Title VII and ADEA claims are related to Mr. Cooper's set-up supervisor selection and training. *See Alexander v. Fulton Cnty., Ga*., 207 F.3d 1303, 1332 (11th Cir. 2000) ("The starting point of ascertaining the permissible scope of a judicial complaint alleging employment discrimination is the administrative charge and investigation. No action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge." (internal citation omitted)), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003); *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 589 n.8 (11th Cir. 1994) ("A plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."). IP complains that Mr. Davis never amended his *pro se* EEOC charge, which "does not in any way include a reference or allusion to [Mr.] Cooper or his selection for set-up supervisor training." (Doc. # 51, at 3.) IP asserts in the reply brief that Mr. Davis appears to have conceded this point.

But Mr. Davis's response brief does address the argument in the introductory paragraph. (*See* Doc. # 50, at 3 n.1.) Mr. Davis argues that he filed

his 2009 EEOC charge *pro se* and included allegations that IP had discriminated against him by promoting younger, less-qualified whites, and Mr. Cooper fits that bill.  He contends IP's decision to offer a position to Mr. Cooper is "like or related to, or grew out of, the allegations contained in [his] charge."  *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004).  Mr. Davis also points out that the EEOC investigation was ongoing at the time that IP offered to promote Mr. Cooper.

Because Mr. Davis's EEOC charge was filed *pro se*, and more importantly, because the alleged race and age discrimination at issue involving Mr. Cooper is "like [and] related to" the alleged race and age discrimination alleged in the EEOC charge, there is no just reason to bar Mr. Davis's claims as they relate to Mr. Cooper's set-up supervisor promotion offer.  The court rejects IP's exhaustion of administrative remedies argument as it relates to Mr. Davis's claims concerning Mr. Cooper.

**D.**    **Whether Mr. Davis Meets His Burdens Under *McDonnell Douglas***

IP argues that even if its other arguments fail, summary judgment must be granted because Mr. Davis cannot meet his burdens under the *McDonnell Douglas* framework.

1. ***Prima Facie Case of Discrimination***

   a. **Whether Mr. Davis Was Qualified**

IP asserts that Mr. Davis fails to make a prima facie case of race or age discrimination because he cannot demonstrate that he was qualified for the set-up supervisor positions that he sought.  A Title VII or ADEA plaintiff must show he is qualified for the job for which he was rejected.  *See Crawford*, 529 F.3d at 970 (Title VII); *Turlington*, 135 F.3d at 1432 (ADEA).  IP claims that Mr. Davis's military career and college education do not make up for what he lacks in Mill leadership and paper-making knowledge.  To support its position, IP points to the testimony of various IP supervisors who say that Mr. Davis is not a natural leader, lacks the respect of his peers, does not demonstrate initiative, and fails to communicate well with his crew.  IP further points to Mr. Davis's admission that he is "not fully familiar with the wet end" of the paper machine.  (Dep. Roy Davis, at 81:7–8 (Doc. # 40-1, at 22).)

Mr. Davis counters that the issue of whether he is qualified is disputed because IP's standards and qualifications are mutable.  He claims that IP has had standard criteria and qualifications for selecting set-up supervisors, but that Mr. Lyles has chosen to ignore the requirements, opting instead to exercise his discretion and to promote persons for subjective reasons without posting the positions or screening applicants against an objective standard.  Mr. Davis cites

*Gear v. Alabama State University*, Case No. 2:09CV970-MEF, 2011 WL 739085 (M.D. Ala. Feb. 24, 2011) (Fuller, J.), for its proposition that the employer-defendants "deprived themselves of the argument that the [plaintiff] failed to meet the required minimum qualifications" where the employer failed to establish what the minimum qualifications for the position were before filling the position.  Mr. Davis also cites *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 643 (11th Cir. 1998), referenced in *Gear*, where the Eleventh Circuit held that an employer may not "redefine job requirements on the fly in an attempt to win summary judgment."  In other words, Mr. Davis appears to argue that IP may not claim that he is unqualified for the job when it has inconsistently applied requirements to Mr. Davis's comparators and where Mr. Lyles, the decision-maker, has admitted that "[t]here's really no criteria for choosing" who is promoted to set-up supervisor.  (Dep. Mike Lyles at 42:23–43:1 (Doc. # 42-1, at 12).)

Additionally, Mr. Davis contends that there is a genuine dispute as to whether he is qualified for a supervisory job.  He contends that Mr. Crosby from HR testified that he met the training requirements.  He points out that there is no documentation in his personnel file to indicate that he is an unworthy candidate.  To the contrary, he claims that "[t]he only documented performance" in his file is from his supervisor Charlie Brackin, who, in September 2005, said that Mr. Davis

exceeded expectations and worked well with others.  (Doc. # 50, at 18 (citing Doc. # 49-12).)  IP does not directly counter Mr. Davis's prima facie case argument in the reply brief.

As IP acknowledges in its initial brief, its criticism that Mr. Davis was unqualified for promotion is basically the same as its reason for not promoting him.  That is, IP's position is the same at the first and second stages of *McDonnell Douglas*.  Upon review of relevant law on this issue, the court will not require Mr. Davis to demonstrate that he was qualified to be a set-up supervisor at the prima facie case stage.  *See Ogletree v. City of Auburn*, 619 F. Supp. 2d 1152, 1163–65 (M.D. Ala. 2009) (applying *Holifield v. Reno*, 115 F.3d 1555, 1562 n.3 (11th Cir. 1997), and *Sledge v. Goodyear Dunlop Tires North America, Ltd.*, 275 F.3d 1014, 1015 n.1 & 1019–20 (11th Cir. 2001)).  Instead, it will be assumed that Mr. Davis makes a prima facie case, and Mr. Davis's qualifications will be assessed at the second and third stages of the *McDonnell Douglas* framework.  Additionally, it would be difficult, maybe impossible, to require Mr. Davis to demonstrate that he in fact qualified where Mr. Lyles has testified that there is no firmly set criteria for who should be selected to become a set-up supervisor.[14]

---

[14] IP also argues that Mr. Stone was promoted by a different decision maker – not Mr. Lyles.  Thus, IP contends, Mr. Davis cannot prove in support of his prima facie case that Mr. Stone as a comparator was "similarly situated in all relevant respects."  *Brown*, 597 F.3d at 1174. This is a valid argument, but a moot one, because Mr. Davis concedes that his claims against IP, as they relate to Mr. Stone's promotion, are time-barred.

Therefore, the court assumes that Mr. Davis satisfies each element of a prima facie case of race and age discrimination. Accordingly, the court proceeds to step two of *McDonnell Douglas* to inquire whether IP has a legitimate non-discriminatory reason for not promoting Mr. Davis.

### 2. *Legitimate Non-Discriminatory Reason for Non-Promotion*

To satisfy its burden of production at step two of *McDonnell Douglas*, IP "need not persuade the court that it was actually motivated by the proffered reasons." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997). IP need only produce evidence that would allow a jury to conclude that the decision not to promote Mr. Davis was not motivated by discriminatory animus. *Id.*

IP claims that both Mr. Northington and Mr. Cooper had seniority over Mr. Davis, superior leadership inclination and rapport among crew members, and superior paper-making knowledge. IP shows through deposition and affidavit testimony that numerous supervisors unanimously supported Mr. Northington's and Mr. Cooper's promotions, yet they unanimously opposed Mr. Davis's promotion because they believed Mr. Davis lacked natural leadership abilities and knowledge about the paper-making process. (*See*, *e.g.*, Dep. Mike Lyles (June 18, 2013) at 149:20–150:20 (Doc. # 42-1, at 39) ("Mr. Davis struggled with getting people to follow his lead in doing the things he wanted them to do."); Decl. Willie J. Perry (Doc. # 45-2, at ¶¶ 6–8) ("I told [Mike Lyles] that I could not recommend

26

Mr. Davis for [set-up supervisor]. . . .  Mr. Davis is not viewed as a leader by his peers nor does he command respect from his peers.  Additionally, Mr. Davis is unable to effectively communicate with his crew.  Mr. Davis does not show initiative, has difficulty learning new skills[,] and he has difficulty in assigning and directing work to other employees.  I recommended Milton Broadnax, James Northington, and Mike Stone to be set-up supervisors based on their initiative to learn the entire paper machine and because they earned the respect of their peers."); Decl. Leroy Byrd (Doc. # 45-5, at ¶¶ 5–6) ("I told Mr. Lyles that I could not recommend Mr. Davis for [set-up supervisor] based on my observations of Mr. Davis's performance and decisions he has made, [and] I do not think he would be successful as a set-up supervisor in the paper mill."); Decl. Jimmy L. Deramus (Doc. # 45-6, at ¶¶ 5–6) ("Based on my observations, I did not hesitate to recommend Mr. Northington and Mr. Cooper. . . . Mr. Lyles also spoke to me about whether I felt Roy Davis should be placed in a set-up supervisor position.  I observed Mr. Davis working on the floor on numerous occasions and never saw the drive and the focus that is required to be a successful supervisor.  Mr. Davis'[s] peers did not look to him for leadership."); Decl. Mike Lyles (Doc. # 45-3, at ¶ 7 ("For Mr. Davis, [management's] comments were unanimous against his selection. "[T]hese opinions impacted my decision.").)[15]

---

[15] That Mr. Lyles consulted and relied upon the opinions of managers who shared either

As for the smaller issue of IP's alleged refusal to offer Mr. Davis the second week of FLL training, IP explains that the course has been infrequently offered due to Melanie Giles's promotion, and the one time that it was offered, Mr. Davis was not selected because Mr. Lyles could send only three of five people who were "supposed to go." (Dep. Mike Lyles, at 91:16–19, 93:2–6 (Doc. # 42-1, at 24–25.)

IP meets its burden of production with multiple but consistent employment-related reasons to intentionally pass over Mr. Davis. The focus shifts back to Mr. Davis to persuade the court that IP's proffered reasons are pretextual. *Combs*, 106 F.3d at 1528.

### 3. *Rebutting the Proffered Reason as Pretext*

"A reason is not pretext for discrimination 'unless it is shown both that the reason was false, and that discrimination was the real reason.'" *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). Mr. Davis must expose "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [IP]'s proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538. Mr.

---

or both of Mr. Davis's race and age significantly undermines any inference of discriminatory animus. *Moulds v. Wal-Mart Stores, Inc.*, 935 F.2d 252, 256 (11th Cir. 1991) (rejecting black plaintiff's argument that "because th[e] assessment of her personality or leadership ability was subjective, it [could ]not be accepted as a legitimate nondiscriminatory reason for her nonselection or that it must be seen as pretextual" where non-white supervisors were involved in decision-making).

Davis may not "recast [IP]'s proffered nondiscriminatory reasons or substitute his business judgment for [IP's].  Provided that the proffered reason[s] [are] one[s] that might motivate a reasonable employer, [Mr. Davis] must meet" each of the proffered reasons "head on and rebut [them]" as untrue.  *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).

### a.    Seniority

Mr. Davis asserts that the proffered reason of lesser seniority is undermined by Mr. Lyles's testimony that seniority only matters "to an extent" and the undisputed fact that promotions to supervisory positions are not governed by the Union's collective bargaining agreement that requires promotion based upon seniority.  Mr. Davis further argues that there is a genuine dispute of material fact as to whether Mr. Northington actually has more departmental seniority than him. *See supra* n.9.  IP's reply brief is silent on the issue of seniority.

Considering the inconsistent testimony and argument concerning whether seniority mattered to IP, as well as the divergent record evidence regarding Mr. Northington's departmental seniority, Mr. Davis casts doubt upon the credence of IP's explanation that Mr. Davis lacked seniority when compared with Mr. Northington or Mr. Cooper.

### b.    Management's Unanimous Opposition

As discussed earlier at the prima facie case stage, Mr. Davis argues that IP may not credibly argue that he is unqualified for the job when IP has inconsistently applied its fluctuating qualifications standards to Mr. Davis's comparators and where Mr. Lyles admitted that there are no certain criteria for qualifying and choosing a set-up supervisor.  He also asserts that there is no evidence that shows that he was unqualified for the set-up supervisor positions that his comparators were offered.  To the contrary, Mr. Davis posits that the record supports his position that he was qualified for the position, (*see* Doc. #50, at 17), and more qualified than the younger, white comparators.

While Mr. Davis's arguments are not devoid of merit, Mr. Davis has not produced evidence to directly rebut IP's explanation that Mr. Northington and Mr. Cooper, but not Mr. Davis, had the confidence of Mill supervisors.  Mr. Davis does not, for instance, produce testimonial evidence that contradicts the deposition and declaration testimony of Mr. Lyles and other supervisors who report that (1) Mr. Davis lacks a propensity for leadership and (2) Mr. Davis does not have an adequate level of knowledge about the Mill's paper-making process.  Mr. Davis's evidentiary submission lacks any rebuttal testimony to show that Mr. Lyles's reasons for not promoting him were false, and that discrimination was the real reason.  (*See generally* Doc. #49.)  Though IP's proffered reasons are subjective,

subjectivity is no grounds to reject the reasons as pretextual.[16]  Mr. Davis must

offer evidence that Mr. Lyles had a discriminatory purpose for crediting various

managers' assessments of Mr. Davis's leadership, initiative, and industry

knowledge.  *See Denney v. City of Albany*, 247 F.3d 1172, 1185 (11th Cir. 2001)

("Absent evidence that subjective hiring criteria were used as a mask for

discrimination, the fact that an employer based a hiring or promotion decision on

purely subjective criteria will rarely, if ever, prove pretext under Title VII or other

federal employment discrimination statutes.").

Furthermore, Mr. Davis's assertions that he was as qualified or better

qualified than Mr. Northington or Mr. Cooper are not enough.  "[A] plaintiff must

show that the disparities between the successful applicant[s'] and his own

qualifications were 'of such weight and significance that no reasonable person, in

---

[16] As the Eleventh Circuit explained in *Chapman*,

Personal qualities . . . factor heavily into employment decisions concerning
supervisory or professional positions.  Traits such as common sense, good
judgment, originality, ambition, loyalty, and tact often must be assessed primarily
in a subjective fashion, yet they are essential to an individual's success in a
supervisory or professional position.

It is inconceivable that Congress intended anti-discrimination statutes to deprive
an employer of the ability to rely on important criteria in its employment
decisions merely because those criteria are only capable of subjective evaluation.
To phrase it differently, subjective reasons are not the red-headed stepchildren of
proffered nondiscriminatory explanations for employment decisions.  Subjective
reasons can be just as valid as objective reasons.

229 F.3d at 1033–34 (internal citations and quotation marks omitted).

the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" *Springer*, 509 F.3d at 1349 (quoting *Cooper*, 390 F.3d at 732). Upon consideration of the duties of a set-up supervisor (*i.e.*, managing crew members and keeping the paper department's machines operating), it is not unreasonable that Mr. Lyles would consider Mr. Northington or Mr. Cooper's leadership ability or paper-making knowledge, and the confidence of a diverse group of managers in both of those candidates, to be more valuable than Mr. Davis's college degree or military background.  It is possible that a reasonable fact finder could conclude that, at the time of their promotions, Mr. Northington and Mr. Cooper had a similar amount of exposure to and knowledge of the wet end of the machine as Mr. Davis.  But Mr. Davis must rebut *every* proffered reason head on.  Mr. Davis offers nothing to support an inference that Mr. Lyles's and the other managers' negative assessment of Mr. Davis's leadership and initiative was a pretextual excuse given to mask discriminatory animus.

### c.      Denial of FLL Training

IP says that it has offered the second week of FLL training only once since Mr. Davis requested it, and at that time, it could only train a limited number of people.  IP further explains that it has discontinued it as an offering since Melanie Giles was promoted to a different position with IP.  (*See* Dep. Mike Lyles 91:13–93:6 (Doc. # 42-1, at 24–25).)  Mr. Davis's opposition brief does not explain why

this reason is inconsistent, implausible, or otherwise pretextual.  Accordingly, Mr. Davis fails to rebut IP's reason for not putting him through the second week of FLL training.

### 4.    *Other Evidence of Discriminatory Intent*

In an effort to substantiate an inference that IP tolerates or encourages racially discriminatory animus, Mr. Davis cites *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1286 (11th Cir. 2008), and *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1341 (11th Cir. 2011), for their propositions that, pursuant to Federal Rule of Evidence 404(b), courts may consider "evidence of other acts of discrimination by the same decision-maker against other employees in the plaintiff's protected group."  *Smith*, 644 F.3d at 1341.  Mr. Davis asserts that the prior *Mays* and *Williams* suits against IP, which allegedly involved the set-up supervisor position, are relevant evidence supporting an inference that Mr. Davis was not promoted because of unlawful discrimination.  However, Mr. Davis's "me too" evidence is not relevant in this case because the *Williams* and *Mays* cases are over a decade old and neither case involved Mr. Lyles.

Mr. Davis also claims that noose-sighting testimony at the Mill and the reported use of the "N-word" in the paper department indicate IP's knowledge of racially discriminatory acts at the Mill and its indifference toward its employees' civil rights.  Mr. Davis suggests that this evidence is part of the "totality of

circumstances" or "constellation of events" that the court should consider. (Doc. # 50, at 25.) But Mr. Davis does not explain how either the prevalence of the 'N' word[17] or the reported noose is related to Mr. Lyles's decision not to promote him to a set-up supervisor position at the Mill. There is no allegation or evidence that Mr. Lyles ever used the "N-word" or had any involvement with respect to the noose incident; nor is there evidence that Mr. Davis himself was a victim of racially derogatory language or conduct. Accordingly, the "N-word" evidence and noose testimony is insufficient to show that the real reason for Mr. Davis's non-promotion was IP's racially discriminatory intent.

### 5.   *Summary*

In sum, because Mr. Davis has not rebutted as pretext every reason proffered by IP for not promoting him to set-up supervisor or allowing him to receive the second week of FLL training, Mr. Davis fails to meet his burden of persuasion under *McDonnell Douglas*. IP's motion for summary judgment is therefore due to be granted.

---

[17] The record shows that Mr. Lyles demoted a set-up supervisor, Tracy Riddle, who allegedly directed a racial slur toward a co-worker. James Northington testified that he was aware of the use of the "N-word" by whites and blacks at the Mill.

## VI.  CONCLUSION

Based on the foregoing analysis, it is ORDERED that IP's motion for summary judgment is GRANTED on Mr. Davis's claims under Title VII, § 1981, and the ADEA.

A separate final judgment will be entered.

DONE this 14th day of February, 2014.

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE
